UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jerald Ramlet,

      Plaintiff,

            Civ. No. 05-2523 (RHK/JSM)
            **MEMORANDUM OPINION**
            **AND ORDER**

v.

E.F. Johnson Company,

      Defendant.

Steven Andrew Smith, Nichols Kaster & Anderson, PLLP, Katherine C. Bischoff, Jackson Lewis LLP, Minneapolis, Minnesota, for Plaintiff.

Steven W. Wilson, Casey E. Jarchow, Briggs and Morgan, PA, Minneapolis, Minnesota, for Defendant.

**INTRODUCTION**

Plaintiff Jerald Ramlet has sued Defendant E.F. Johnson Company ("E.F. Johnson") alleging that his employment was unlawfully terminated due to his age.[1]  E.F. Johnson now moves for summary judgment on the grounds that it terminated Ramlet's employment for poor performance and that age was not a factor in that determination.  For the reasons set forth below, the Court will grant E.F. Johnson's Motion in part.

---

[1] Ramlet was forty-two years old when terminated.  (Compl. ¶ 6.)

**BACKGROUND**

**I.    Ramlet's Employment with E.F. Johnson**

E.F. Johnson is a Texas company that makes and sells radio communication systems to military, police, and government agencies. (Mem. in Supp. at 3.) In September 2001, E.F. Johnson hired Ramlet as its "Vice President, Sales," reporting to President/General Manager Dave Hattey. (Ramlet Dep. Tr. at 23, Ex. 3.) Over the next two years, Ramlet had several different supervisors; on July 8, 2002, Ramlet began reporting to Dennis Blaine, Executive Vice President of Sales & Marketing. (Id. at 50, Ex. 9.)

In 2003, Ramlet became E.F. Johnson's Director of Sales for the Central United States. (Id. at 52, Ex. 9.) In that position, Ramlet's sales territory initially consisted of fourteen states: Texas, Oklahoma, Kansas, Missouri, Nebraska, Iowa, North Dakota, Minnesota, Arkansas, Indiana, Illinois, Ohio, Michigan, and Wisconsin. (Id. at 57, Ex. 12.) Later, Ohio, Michigan, and Indiana were reassigned to other sales territories and Louisiana and South Dakota were added to his territory. (Mem. in Supp. at 4.) Other than in South Dakota, where he received the assistance of a customer service assistant, Ramlet was the only sales representative within his sales territory. (Id. at 55-56.)

For the first several months of his employment, Ramlet reported to Blaine. (Id. at 59, Ex. 12.) Blaine was eventually replaced by Brenda Jackson and, on January 4, 2004, Ramlet began reporting to her. (Id. at 59, Ex. 13.) On August 1, 2004, Ramlet began reporting to John Suzuki, Vice President of Sales for state, local, international, and

commercial accounts, who in turn reported to Jackson. (Id. at 68, Ex. 17; Suzuki Dep. Tr. at 8.)

## II. Jackson's Review of Ramlet's Computer Files

In 2005, Suzuki became suspicious that Ramlet was working for a different company[2] and, at a meeting with Jackson, asked her for advice on how to deal with these concerns. (Id. at 49; April 7, 2006 Jackson Dep. Tr. ("Jackson Dep. Tr. 1") at 17.) Jackson decided to review Ramlet's computer files for possible evidence that he was performing services for another company. (Jackson Dep. Tr. 1 at 17-18.) To that end, she developed a plan by which the contents of Ramlet's company laptop would be copied onto a server while he was attending a personnel review at E.F. Johnson's Corporate headquarters. (Id.) On July 5, 2005, Suzuki e-mailed Jackson confirming the plan:

> Here is a summary of what we discussed
>
> When [Ramlet] comes in on Thursday, we will have IT review his computer to determine if there is any evidence that Jerry is running a separate business.

(Smith Aff. Ex. L.)

On July 7, 2005, during Ramlet's personnel review, E.F. Johnson's IT department copied the information from his laptop onto a secured server that Jackson could access. (Jackson Dep. Tr. 1 at 20.) Ramlet did not know that the data on his computer had been

---

[2] The reasons for Suzuki's suspicions were that Ramlet's sales numbers were low and his cell phone bills reflected numerous calls throughout Minnesota, even though less than 1 percent of Ramlet's business with E.F. Johnson came from Minnesota. (Suzuki Dep. Tr. at 52-53.)

3

copied. (Id. at 18; Ramlet Dep. Tr. at 107.) Jackson then reviewed Ramlet's files over the next several days. (Jackson Dep. Tr. 1 at 20-21.)

While searching through the files copied from Ramlet's laptop, Jackson found a business plan for an entity identified as Commercial Lighting Maintenance ("CLM"), which Jackson believed indicated that Ramlet was acting as an officer of CLM. (Id.) She also discovered e-mail communications between Ramlet and his wife that Jackson believed indicated that Ramlet was helping his wife start a new business. (Jackson Dep. Tr. 1 at 29-30; Ramlet Dep. Tr., Ex. 22.) Also discovered were e-mail messages between Ramlet and a former co-worker that she believed indicated that Ramlet was soliciting prostitutes. (Jackson Dep. Tr. 1 at 11.)

### III. Ramlet's Termination

After reviewing Ramlet's files, Jackson told Suzuki "to continue to work with [Ramlet]" and that "[they] were going to dismiss [him]." (Jackson Dep. Tr. 1 at 24-25.) Over the next several weeks, Jackson met with Ellen O'Hara, E.F. Johnson's President, to discuss what she had found on Ramlet's computer. (Id. at 28.) O'Hara responded by telling her to "[w]ork with Mike Gamble. Do what you need to do." (Id. at 30.) Jackson then informed Gamble, the Vice President of Administration, of what she had found on Ramlet's computer and recommended that Ramlet's employment be terminated; Gamble told her to preserve Ramlet's computer files and to proceed with the termination. (Id. at 28-29.)

On August 18, 2005, Ramlet visited E.F. Johnson's headquarters in Irving, Texas, and met with Gamble and Suzuki. (Ramlet Dep. Tr. at 116; Mem. in Supp. at 14.) During that

4

meeting, Ramlet was informed that his employment was terminated because he was the owner and president of another business. (Ramlet Dep. Tr. at 116-17.) No other reason was given at that meeting for Ramlet's employment termination. (See Id.) Ramlet requested further explanation and, when the meeting ended, Ramlet and Gamble went to Gamble's office to discuss the termination further. (Id. at 117.) In the meantime, Suzuki sent an email to E.F. Johnson's sales staff stating that "[e]ffective August 18, [Ramlet had] left the company." (Id. at 119; Smith Aff. Ex. O.)

While in Gamble's office, Ramlet denied that he was involved with another business and asserted that the files on his computer had been misunderstood. (Id. at 117-19; Gamble Dep. Tr. at 20-21.) Gamble decided to delay Ramlet's employment termination until he could investigate Ramlet's assertions further. (Ramlet Dep. Tr. at 119-20.) Ramlet was then sent home and told he would be contacted when more information became available. (Id. at 119.)

During the next several weeks, several of Ramlet's colleagues contacted him to discuss Suzuki's announcement that he had left the company. (See id. at 151-55.) During one of these conversations, Tim Guin, a Director of Sales for E.F. Johnson, told Ramlet that Suzuki had said that he wanted to hire "a bunch of young, dumb, and full of cum guys." (Id. at 155, Ex. 26.) James Swan, E.F. Johnson's Director of Indirect Channels between May 2004 and April 2005, stated that "[o]n at least one occasion during [his] employment, John Suzuki told [him] that he wanted to hire 'young studs' to replace the older sales people." (Id. at 155, Ex. 26.)

On September 2, 2005, after investigating Ramlet's explanations of what had been found on his computer, Ramlet's termination was made effective.[3] (Ramlet Dep. Tr. at 79; June 29, 2006 Jackson Dep. Tr. (Jackson Dep. Tr. 2) at 28.) At this time, Ramlet was forty-two years old. (See Ramlet Dep. Tr. Ex. 30.) On September 13, 2005, Ramlet received an employment termination letter from R. Andrew Massey, General Counsel to E.F. Johnson. (Smith Aff. Ex. M.) The letter listed three reasons for Ramlet's termination: "(i) failure to meet satisfactory sales activity; (ii) failure to meet revenue objectives; and ([iii]) a willful failure to perform duties with the Company." (Id.)

## IV. Ramlet's Commissions

Under E.F. Johnson's FY05 Commission/Bonus Plan, Ramlet was entitled to a one percent commission on his monthly product shipments. (Ramlet Dep. Tr. at 75; Smith Aff. Ex. S.) Ramlet asserts that he was not paid certain commissions to which he is entitled. (Mem. in Opp'n at 17, 41; Ramlet Dep. Tr. at 73-75.) E.F. Johnson responds by saying that, under the employment contract, it had the sole discretion to determine the amount of commissions which Ramlet had earned and that it acted appropriately in determining his commission payments. (Mem. in Supp. at 34-35.)

**STANDARD OF DECISION**

---

[3] The parties have not explained the manner in which Ramlet was terminated on September 2, 2005. (Mem. in Opp'n at 14; Mem. in Supp. at 15.) Also, Ramlet contends that this was a "second termination." (Mem. in Opp'n at 14.) For purposes of the instant Motion, this distinction is irrelevant.

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Cattrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex, 477 U.S. at 322; Mems v. City of St. Paul Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the non-moving party. See Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The non-moving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**ANALYSIS**

Ramlet alleges that his employment was unlawfully terminated because of his age and that E.F. Johnson denied him payment for commissions that he earned. (Compl. at 2-5.) He also asserts that he was unlawfully denied a copy of his personnel records. (Id. at 4.)

**I.    Age Discrimination**

The Age Discrimination in Employment Act ("ADEA") and the Minnesota Human Rights Act ("MHRA") both forbid an employer from taking adverse employment actions against an employee because of his age. 29 U.S.C. § 623(a)(1); Minn. Stat. § 363.03, subd. 1(2)(c). To establish a claim of intentional age discrimination, a plaintiff may present direct evidence of such discrimination or may prove his claim through circumstantial evidence.[4] See Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir. 2003). Here, Ramlet asserts that he offers direct and indirect evidence of discrimination. Accordingly, the Court will analyze Ramlet's claim under each test.

**A.    Direct Evidence**

Ramlet proffers Suzuki's alleged statements (as related to Ramlet by Tim Guin) that he wanted to hire some "young, dumb, and full of cum guys" and that he "intended to hire some 'young studs' to replace the older sales people" (as related to Ramlet by James Swan)

---

[4] Age discrimination claims under the MHRA are analyzed in the same fashion as claims under the ADEA. Chambers v. Metro. Prop. & Cas. Ins. Co., 351 F.3d 848, 855 (8th Cir. 2003) (citation omitted).

as direct evidence of age discrimination. (Mem. in Opp'n at 21.) Direct evidence of employment discrimination is evidence that establishes "'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004) (quoting Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997)). Direct evidence consists of "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude. . . sufficient to permit the factfinder to find that the attitude was more likely than not a motivating factor in the employer's decision." Browning v. President Riverboat Casino-Missouri, Inc., 139 F.3d 631, 634 (8th Cir. 1998) (citations omitted). It does not, however, "include 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.'" Id. at 635 (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989)).

      E.F. Johnson asserts that Suzuki's alleged comments are not direct evidence of discrimination because he was not a decision-maker in the termination of Ramlet's employment. In order to demonstrate that Suzuki was in fact a decision-maker, Ramlet asserts that he previously held Suzuki's position and that, during that time, it was "completely [his] decision on who [he] hired or who [he] fired" and that the "VP of sales had complete autonomy and complete control over hiring and firing people." (Ramlet Dep. Tr.

9

at 166.) These statements, however, only establish that Ramlet may have previously been a decision-maker and are not evidence that Suzuki was a decision-maker in the instant case.

Ramlet also proffers Suzuki's own testimony that he had "recommended" that Ramlet's employment be terminated and had been "involved" in the decision to terminate Ramlet as evidence that Suzuki was a decision-maker. (Suzuki Dep. Tr. at 78-79.)[5] These isolated statements, however, do not create a genuine issue of fact that Suzuki was a decision-maker. Ramlet fails to present any facts to support his argument that Suzuki was a decision-maker because he was "involved" in the decision to terminate Ramlet's employment. Suzuki explained his involvement in Ramlet's termination by stating that he "provided documentation [to Jackson and Gamble] and made a recommendation" to them, and that his "input [in the decision] was focused around [Ramlet's] performance." (Id. at 79-81.) Jackson testified to the same facts, stating that "[Suzuki] provided [her] with information" but that "[she] made the decision" to terminate Ramlet's employment. (Jackson Dep. Tr. 1 at 61-62.) She also testified that "once [Suzuki] provided [her] with the information, he was pretty much taken out of the [] decision-making process." (Id. at 63-64.)

Jackson's testimony also indicated that her decision to terminate Ramlet's employment was not based solely on his job performance, which was the focus of Suzuki's

---

[5] When asked the question "did you give a recommendation that Mr. Ramlet be terminated?", Suzuki answered: "Yes, I did." (Suzuki Dep. Tr. at 78.) In response to the question "were you involved in the decision to terminate Mr. Ramlet?," Suzuki responded: "Yes." (Id. at 79.)

"input." Instead, Jackson testified the decision was based on the information that she found on his computer. (Id. at 27-30.)[6] Accordingly, the Court determines that Ramlet has failed to establish that Suzuki was a "decision-maker" in the termination of his employment and, therefore, he has failed to present direct evidence that the decision to terminate his employment was motivated by his age.

### B. Burden-Shifting Framework

Where there is no direct evidence of discrimination, the McDonnell Douglas burden-shifting framework is applied. Turner v. Honeywell Fed. Mfg. & Techs., LLC, 336 F.3d 716, 720 (8th Cir. 2003) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801-04 (1973)). Under this framework, a presumption of discrimination is created when the plaintiff meets his burden of establishing a *prima facie* case of employment discrimination. Rothmeier v. Inv. Advisers, Inc., 85 F.3d 1328, 1332 (8th Cir. 1996) (citation omitted). A minimal evidentiary showing will satisfy this burden of production. Turner, 336 F.3d at 720 (citation omitted). Upon establishing a *prima facie* case of discrimination, the burden of production shifts to the defendant to show that it had a legitimate, nondiscriminatory reason for its actions. "Once this burden has been met, the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination. At all times, the burden of persuasion

---

[6] When asked the question "If Mr. Ramlet's performance increased between his performance review and termination, would Mr. Ramlet continue to be working for E.F. Johnson?", Jackson answered: "Not after we found what we found on his computer." (Jackson Dep. Tr. 1 at 27.)

remains with the plaintiff." Pope v. ESA Servs, Inc., 406 F.3d 1001, 1007 (8th Cir. 2005) (citations omitted).

### 1.     Ramlet's *Prima Face* Case

To establish a *prima facie* case of employment discrimination, a plaintiff must show that (1) he was a member of a protected class (in this case, over the age of forty); (2) the employer took some type of adverse employment action against him; (3) he was meeting his employer's reasonable expectations at the time of his termination; and (4) age was a factor in the employer's decision to take the adverse action. Chambers v. Metro. Prop. & Cas. Ins. Co., 351 F.3d 848, 855 (8th Cir. 2003). The fourth element of the *prima facie* case can be established with evidence that the plaintiff was replaced by someone substantially younger, Haas v. Kelly Servs., Inc., 409 F.3d 1030, 1035 (8th Cir. 2005), or with other evidence "adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion," O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996) (alteration in original) (internal quotation and emphasis omitted).

The parties do not dispute that Ramlet was over the age of forty and that his employment termination constituted an adverse employment action. E.F. Johnson, however, has provided evidence that Ramlet was not meeting its reasonable expectations at the time his employment was terminated. (Mem. in Supp. at 23.) First, 85% of Ramlet's sales came from a single "existing account" with Texas DPS. (Suzuki Dep. Tr. at 35; Ramlet Dep. Tr. Ex. 20.) Second, Ramlet's earnings in the second quarter of 2005 totaled

$116,000 and his earnings projection for the third quarter were $550,000, but his sales quota for each quarter was $1,000,000.  (Id.; Ramlet Dep. Tr. at 249-50, Ex. 26 at 10264-01000074.)  Third, Ramlet consistently began a sales quarter with high sales expectations but would often lose or delay many of those early sales forecasts.  (Suzuki Dep. Tr. at 51-52.)

Ramlet does not dispute these facts, but instead relies on Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 921 (8th Cir. 2000), where the Eighth Circuit held that an employer had not established that a sales representative failed to meet its reasonable expectations because he "lacked sufficient product knowledge, could not effectively communicate with customers, and acted unprofessionally during sales calls."  Id.  In that case, the employee had consistently received average or above average performance reviews and had received several national sales rewards from his employer.  Id. at 918.  Ramlet asserts that "[a]t the time of his termination, Ramlet was E.F. Johnson's number five salesperson"[7] and that "Suzuki praised Ramlet for his diligence on [an] account."  (Mem. in Opp'n at 29; Smith Aff. Ex. U.)  Accordingly, he argues that, under Fisher, he was meeting E.F. Johnson's reasonable expectations.  See id. at 920 ("In the context of sales. . . sales volume is generally the principal indicator of a salesperson's performance.")

---

[7] E.F. Johnson argues that Ramlet's sales data are artificially inflated when compared to other sales representatives because six sales representatives worked for only part of 2005 and Ramlet had the largest sales territory of E.F. Johnson's sales representatives.  (Reply Mem. at 5.)  For purposes of the instant Motion, the Court does not need to address this issue.

13

Unlike Fisher, E.F. Johnson has provided a valid explanation as to why sales volume is not the principal indicator of Ramlet's performance and why it could reasonably have expected Ramlet's sales number to be higher – 85% of Ramlet's sales came from a single, existing account with Texas DPS. Ramlet's failure to meet his sales quotas and his lost accounts, therefore, cannot be dismissed from the "reasonable expectation" inquiry simply because he had high sales numbers in comparison to his colleagues. Accordingly, the Court determines that E.F. Johnson had a reasonable expectation that Ramlet would meet his sales quotas and lose a smaller portion of his forecasted accounts.

Ramlet also fails to present evidence "adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." O'Connor, 517 U.S. at 312. Ramlet does not dispute that he was not replaced by a younger individual. Instead, he proffers Suzuki's statements that he wanted "to bring in a bunch of young, dumb, and full of cum guys" and that he wanted to "hire 'young studs' to replace the older sales people" as evidence of a discriminatory motive behind his employment termination. As noted above, Ramlet has failed to establish that Suzuki was a decision-maker in the process by which his employment was terminated.[8]

---

[8] Even if the Court had concluded that Suzuki was a decision-maker, his comments do not provide evidence of discrimination in the decision to terminate Ramlet's employment. Instead, they provide evidence of his preferences during the hiring process. Such evidence is insufficient to establish employment discrimination without support that Suzuki intended to terminate the employment of older workers. See Erickson v. Farmland Industries Inc., 271 F.3d 718, 725 (8th Cir. 2001) (Supervisor's statement that "[t]wenty years is too long. You should have moved five years ago" not enough to establish age discrimination after employee was demoted).

Accordingly, the Court determines Ramlet has not established a *prima facie* case of employment discrimination because he did not meet E.F. Johnson's reasonable expectations and he has not provided evidence that age was a factor in the decision to terminate his employment.

### 2. Pretext

Assuming *arguendo* that Ramlet has made a *prima facie* case that his employment termination was due to his age, he has failed to establish that E.F. Johnson's proffered reasons for that termination were a mere pretext for age discrimination. To establish pretext, Ramlet must demonstrate that E.F. Johnson's asserted reason for terminating his employment was false and that the circumstances permit a reasonable inference that the real reason for his termination was age discrimination. Johnson v. AT&T Corp., 422 F.3d 756, 763 (8th Cir. 2005).

E.F. Johnson proffers Ramlet's overall poor performance, his involvement in two new businesses, and his solicitation of prostitutes as the reasons for his employment termination. (Mem. in Supp. at 27.) Ramlet appears to argue that each of these underlying reasons for his termination is false. (See Mem. in Opp'n at 5-13.) However, "[a] proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination." Twymon v. Wells Fargo & Co., 462 F.3d 925, 935 (8th Cir. 2006). Ramlet has not provided evidence that O'Hara, Jackson, and Gamble did not honestly believe that he was performing

poorly, that he was working for two other businesses, or that he had solicited prostitutes. Accordingly, his attempt to challenge these facts does not establish pretext.

Ramlet also argues that he can establish pretext because E.F. Johnson employed "shifting reasons" for his employment termination. In support, Ramlet points to several portions of the record in which E.F. Johnson employees gave different reasons for his employment termination. (Mem. in Opp'n at 21.) E.F. Johnson asserts, however, that "[n]umerous things led to Ramlet's termination." (Id. at 27.) Ramlet's review of the record merely illustrates several of the "numerous" reasons proffered by E.F. Johnson for his termination. Furthermore, even if the Court were to assume that E.F. Johnson has provided "shifting reasons," these reasons do not suggest that the decision to terminate Ramlet's employment was motivated by his age. See Kohrt v. MidAmerican Energy Co., 364 F.3d 894, 898 (8th Cir. 2004) (affirming grant of summary judgment to employer despite plaintiff's allegation that employer gave conflicting reasons for its refusal to hire plaintiff, because plaintiff failed to connect conflicting reasons to age discrimination).

Ramlet asserts that he can establish pretext because E.F. Johnson treated him differently than other similarly situated employees. "Contrasting the treatment of similarly situated employees outside the protected class with the employee's treatment is one way to point towards a [discriminatory] based motivation." Twymon, 462 F.3d at 936. Ramlet points to two statements, each made by his superiors, which he claims indicate that he was treated differently than other employees when his employment was terminated: 1) Suzuki's statement that "half of [his] team achieved quota and the other half did not" (Suzuki Dep. Tr.

16

at 42), and 2) Jackson's statement that another employee was put "under a performance improvement plan" when he failed to develop his sales territory (Jackson Dep. Tr. 2 at 16; Mem. in Opp'n at 35-36). Ramlet also points to Suzuki's failure to terminate another E.F. Johnson employee upon learning that he was an investor in a competing company. (Mem. in Opp'n at 36.)

Ramlet, however, fails to provide evidence that these allegedly similarly situated employees were members "outside the protected class." In other words, Ramlet has failed to provide evidence that these employees were younger than 40 years old. Furthermore, he has not established that these employees were similarly situated to him. As stated above, several factors contributed to the decision to terminate Ramlet's employment. His attempts to find a "similarly situated employee," however, each compare an individual who experienced only one of these factors. Accordingly, the Court determines that Ramlet has not established that he was treated differently than a similarly situated employee who was not a member of the protected class.

Ramlet also argues that he was performing satisfactorily at the time his employment was terminated and that Suzuki's statements create an inference that age was a factor in the decision to terminate his employment. Because Suzuki was not a decision-maker, the Court rejects these arguments and determines that Ramlet has failed to establish E.F. Johnson's proffered reasons for his employment termination were pretextual.

**II.     Unpaid Commissions and Personnel Records**

Ramlet also alleges that E.F. Johnson failed to pay him commissions to which he is entitled and failed to provide him with his personnel records in violation of Minnesota law. (Compl. ¶¶ 23-47.) Having concluded that summary judgment must be granted in E.F. Johnson's favor on Ramlet's federal claim, the Court's original jurisdiction has been extinguished.[9] Pursuant to 28 U.S.C. § 1367(c)(3), the Court may, *sua sponte*, decline to exercise supplemental jurisdiction over a pendent state-law claim if it has dismissed all claims over which it has original jurisdiction. Johnson v. City of Shorewood, 360 F.3d 810, 819 (8th Cir. 2004). And, when all federal claims are eliminated before trial, the balance of factors to be considered in deciding whether to exercise supplemental jurisdiction over a pendent state-law claim typically militates against exercising jurisdiction. Id. (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)). Based on Section 1367(c)(3) and Johnson, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, it is

**ORDERED**:

---

[9] The Court notes that the parties are diverse and that Ramlet pled damages in excess of $75,000 for unpaid commissions. (See Compl. ¶¶ 27, 36, 42, 47.) Ramlet testified, however, that he is entitled to approximately $7,300 in unpaid commissions. (Ramlet Dep. Tr. at 74.) He has also failed to plead damages for his personnel records claim. Accordingly, the Court cannot exercise diversity jurisdiction over Ramlet's state law claims. See 28 U.S.C. § 1332(a).

1. Defendant E.F. Johnson Company's Motion for Summary Judgment (Doc. No. 30) is **GRANTED** with respect to Counts One and Two of Plaintiff's Complaint (Doc. No. 1) and Counts One and Two are **DISMISSED WITH PREJUDICE**; and

2. The Court **DECLINES** to exercise supplemental jurisdiction over the claims asserted in Counts Three, Four, Five, Six and Seven of the Complaint; Counts Three, Four, Five, Six, and Seven are **DISMISSED WITHOUT PREJUDICE**.[10]

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated: November 27, 2006                    s/Richard H. Kyle
                                            RICHARD H. KYLE
                                            United States District Judge

---

[10] See 28 U.S.C. § 1367(d).